IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 9, 2025

**STATE OF TENNESSEE v. RAYMOND ANTONIO SMITH**

**Appeal from the Circuit Court for Bedford County**
No. 19494    Forest A. Durard, Jr., Judge

———————————————————

**No. M2024-01108-CCA-R3-CD**

———————————————————

Defendant, Raymond Antonio Smith, appeals from his convictions for first degree premeditated murder and theft of property valued at $2,500 or more but less than $10,000, for which he is serving a sentence of life plus twelve years. On appeal, Defendant contends that the evidence was insufficient relative to premeditation and to the stolen property's value. After a thorough review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

M. Todd Ridley, Assistant Public Defender—Appellate Division; Donna O. Hargrove, District Public Defender; and James R. Tucker, Jr., and Michael J. Collins, Assistant District Public Defenders, for the appellant, Raymond Antonio Smith.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike Randles and Lisa Zavogiannis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

This case arises from the March 15, 2022 bludgeoning death of Sarah "Angel" Johnson ("the victim") and the related theft of a 2000 Toyota 4Runner ("the 4Runner") belonging to Kathy[1] Mangrum. The December 2022 term of the Bedford County Grand

---

[1] Because multiple members of the Mangrum family are involved in this case, we will refer to them by their first names for clarity. We intend no disrespect in doing so.

Jury issued an indictment charging Defendant with first degree premeditated murder and theft of property valued at $2,500 or more but less than $10,000. *See* Tenn. Code Ann. §§ 39-13-202(a)(1); -14-103(a).

The trial testimony established that the victim and Defendant spent March 15, 2022, at the home of an acquaintance, Eric Mangrum, who lived with his mother, Kathy, on Sims Road ("Kathy's house"). That evening, Defendant killed the victim in front of Kathy before fleeing the scene in Kathy's 4Runner, which he crashed a short distance away at the intersection of Sims Road and Henslee Road. Defendant walked away from the crash site and stopped at several properties in the rural neighborhood, during which time he changed his clothing, before being arrested on Henslee Road early on the morning of March 16.

At trial, John Harris, Jr., testified that he drove a taxi for Mullen's Transportation Service ("Mullen's"). On March 15, 2022, at 4:14 a.m., Mr. Harris picked up Defendant and the victim at Bird Road and drove them to an address on Sims Road.

Lydia Shepherd[2] testified that she and a friend, DeMarco Marsh, stopped by Kathy's house to say hello to Eric. When they arrived, Kathy's car and another vehicle were parked at the house. Eric answered the door and invited them in. Ms. Shepherd said the victim was sitting on the couch and using a laptop. A shirtless man Ms. Shepherd identified as Defendant was "pacing back and forth through the house." Ms. Shepherd stated that Defendant pulled Eric aside to speak to him two or three times during the visit. Ms. Shepherd agreed to drive Eric to a convenience store to buy some cigarettes. After purchasing the cigarettes, Ms. Shepherd drove Eric back to Kathy's house and noticed that Kathy's 4Runner was gone. Ms. Shepherd noted that Eric appeared to be enjoying the visit and that he was "kind of trying to string it [along] a little more," but she was in a hurry to get home and left as soon as Eric exited her car.

Later that night Ms. Shepherd learned that the victim had been murdered. Using her Google Maps history, she told Tennessee Bureau of Investigation ("TBI") Special Agent Josh Anderson that she and Mr. Marsh arrived at Kathy's house for the first time at 7:39 p.m.; that she, Mr. Marsh, and Eric got to the convenience store at 7:57 p.m.; and that they returned to Kathy's house a little after 8:00 p.m.

On cross-examination, Ms. Shepherd denied that she provided an alibi for Eric and denied that Eric gave her methamphetamine in exchange for an alibi. Ms. Shepherd acknowledged that she had pending charges in Williamson County for "theft of a vehicle over $10,000." She stated that, in Marshall County, she had a felony methamphetamine "charge"; that she had committed aggravated burglary; and that she "[m]aybe" had an

---

[2] The prosecutor called Ms. Shepherd by the surname "Jackson," but "Shepherd" is the name she used when introducing herself.

identity theft charge. She also acknowledged that, in Bedford County, she had charges for three counts of identity theft and three counts of forgery. Ms. Shepherd testified that the State did not directly or implicitly promise her anything in exchange for her testimony.

Mr. Marsh testified consistently with Ms. Shepherd regarding how they came to be at Kathy's house and who was there when they entered. He said that Ms. Shepherd was "weirded out" and that there was "a bad vibe" at the house. Mr. Marsh stated that they agreed to give Eric a ride "because [they] wanted to get out of there." Mr. Marsh stated that he and Ms. Shepherd went inside the convenience store and after returning to the car, they talked for about fifteen minutes before going back to Kathy's house.

Mr. Marsh testified that, when they pulled into the driveway, they had to tell Eric several times to get out of the car because they needed to leave. Mr. Marsh stated that, in the process of trying to get Eric out of the car, Eric noticed that a vehicle was missing. Eric told them, "I hope these people didn't steal my mama's car," which Mr. Marsh thought was a joke.

On cross-examination, Mr. Marsh testified that he was inside Kathy's house for fifteen to twenty-five minutes. Mr. Marsh said that he did not notice anything unusual when they returned to the house. Mr. March acknowledged that, in 2022, he pleaded guilty to fraudulent use of a credit card.

Kathy testified that she owned Kathy's house and that she had two adult children, Eric and Leah. As established by Kathy's testimony, crime scene photographs, and law enforcement diagrams, Kathy's house was rectangular and had a laundry area, a kitchen, three bedrooms, and a living room. The living room had a wood-burning fireplace with a wrought iron grate ("the fireplace grate"), and Kathy kept a stack of firewood to the right of the kitchen doorway. The front door and living room windows were covered with sheets fashioned as curtains. Kathy said that she was in the process of fixing up the house and that the kitchen sink did not work.

Kathy testified that, on March 15, 2022, Defendant and the victim came to the house to visit Eric. She did not know either of them, but it was not unusual for Eric to have people over. Kathy stated that she and the victim discussed the victim's children but that she barely spoke to Defendant, who stayed in one of the back rooms with Eric.

Kathy testified that she was taking a nap in her bedroom when she was awakened by the victim's shouting, "Baby don't hit me no more." Kathy went into the living room where she saw the victim lying on the floor in front of the fireplace with Defendant kneeling over her holding the fireplace grate. Kathy stated that the victim did not have a weapon or fight back. Kathy saw Defendant hit the victim in the head "[h]ard" with the fireplace grate

- 3 -

"[q]uite a few" times.  Kathy said that the victim stopped talking and was bleeding.  Kathy, Defendant, and the victim were the only people in the house.

Kathy testified that she did not try to get between Defendant and the victim because she was afraid for her life.  Kathy said that Defendant saw her and told her to sit down.  After she complied, Defendant told her to give him her car keys, and he left in her 4Runner.  Kathy stated that she did not consent for Defendant to take or keep the 4Runner.  Kathy stated that Defendant also took her cell phone.  Kathy said that at the time Defendant stole her 4Runner she had it for sale for $3,000.

Kathy testified that, after Defendant left, she ran out the side door into the woods.  She said that she was afraid Defendant would kill her because she had seen him beat the victim to death.  She tried to walk to a friend's house but became lost in the woods.  She eventually found the main road and followed it to her friend's house.  She did not know at what time she arrived at her friend's house, although she thought that she had been in the woods for hours.  Kathy said that she asked her friend to wait to call her daughter Leah so that Kathy could "let [her] head come back because [she] was in shock."  Kathy stated that she did not sleep and that Leah arrived at the friend's house the next morning.  Kathy said that Leah told her that she needed to let the police know she was alive.  Kathy stated that she had her friend call the police before noon.  Kathy agreed she told police that, during the murder, the victim was wearing pants with holes in them and a tank top.

Leah Mangrum testified that, on the evening of March 15, 2022, her boyfriend drove her to visit Kathy.  Kathy's 4Runner was not in the driveway when they arrived.  Leah's boyfriend stayed in his truck, and Leah walked to the side door, which was cracked open.  Leah was speaking on the phone with Eric, who was at a neighbor's house, and she told him that Kathy was not at home and that she was going inside to see if Kathy had left a note.  She entered the house, and when she saw the victim's body, she thought that it was Kathy.  Leah said that the fireplace grate was on top of the victim's back and that she "slung it up against the door" before listening for a heartbeat or breathing.  Leah tried to turn the victim over to begin CPR, but she realized that the victim was dead.  Leah stated that she got blood all over herself in this process.  Leah did not see anyone else in the house.

Leah identified several crime scene photographs.  The victim was lying face down on the living room floor beside the front door and in front of the kitchen threshold; the stack of firewood was beside the victim.  A large quantity of blood was pooled around her upper torso and spattered around the room.  The victim was wearing a tank top, underwear, and black socks.  A long piece of firewood on the floor beside the victim's body was half covered in blood.  A forked piece of firewood laying on the stack of firewood was also half covered in blood.  The fireplace grate, which was beside the victim's body, had four upward-facing tines; one of them was bent downward.

Leah testified that she went outside, where she saw Eric speaking to her boyfriend. Leah told the men that Kathy was dead; Eric went inside, and about five minutes later, Leah's boyfriend followed. Leah said that they "didn't stay in there very long" before exiting together. Leah's boyfriend called the police.

Leah testified that, at some point that evening, a friend called and informed her that Kathy was alive and at a friend's house. When Leah arrived at the friend's house, Kathy was "hysterical." Leah stated that Kathy was wet and her clothes were "tor[n] up." Leah said that she told Kathy to call the police.

On cross-examination, Leah clarified that Eric had called her when she and her boyfriend were en route to Kathy's house; Eric told her that the door was locked and that he was at a neighbor's house to get out of the rain. When asked whether she told a TBI agent that she thought Eric had killed Kathy, Leah testified that she had discussed "some of the violent acts that [Eric] had done before" and that Eric had "always had issues." Leah stated that, on the evening of March 14, she had spoken to Kathy on the phone and that Kathy and Eric were arguing, but that later in the night "everything had subsided." Leah was afraid that Eric and Kathy had "got[ten] into it" on the night of the murder and that "maybe something had happened." Leah testified that Eric was "more stunned than anything" after they discovered the victim. Leah agreed that Eric was in the house alone with the victim's body for about five minutes.

Taylor Swiderski testified that, on March 15, 2022, he was at home on Henslee Road when he heard a vehicle crash in the direction of Sims Road. Mr. Swiderski drove to the crash site, where he found the 4Runner with its engine running, all four of the vehicle's doors "wide open," the lights on, and loud music playing. No one was there. Mr. Swiderski called 911 to report the crash and spoke to a first responder before returning home. Mr. Swiderski identified photographs of the 4Runner.

Bedford County Sheriff's Office ("BCSO") Deputy Gabrielle Doyle testified that she received a call about a car crash with potential injuries at 8:05 p.m., that she arrived at the crash site within twenty minutes. Deputy Doyle stated that she and EMS workers looked around the vehicle and adjacent woodline and called out to see if anyone was nearby, but no one responded. Deputy Doyle said that a prescription bottle in the 4Runner contained the Sims Road address of Kathy's house, which was two tenths of a mile away and matched the vehicle's registration. Deputy Doyle and another officer went to Kathy's house and found the side door partially open. They knocked and announced themselves several times, but no one responded, so they left.

Deputy Doyle testified that she and Tennessee Highway Patrol Trooper Barry Qualls later drove to Kathy's house after two additional calls came into police dispatch regarding that property. Leah, Eric, and Leah's boyfriend were outside; Leah had blood

on her hands and clothing and was crying. Leah told them that Kathy was unresponsive inside the house. Deputy Doyle testified that Leah led them into the house through the side door. Deputy Doyle saw the victim, and she and Trooper Qualls secured the scene. Deputy Doyle noted that Leah told her, and she observed, that Eric "had no emotions" when he saw the victim's body.

BCSO Detective Savannah Martin testified that she was dispatched to Kathy's house for the homicide call and spoke to Leah and her boyfriend. Detective Martin gave Leah her cell phone number. At some point in the evening, Detective Martin went to another address on Sims Road to watch a Ring camera recording of a "prowler." At 3:18 a.m. on March 16, Detective Martin received a text message stating, "That is not [Kathy] Mangrum." The person stated that Kathy had fled the house and "mentioned the [B]lack male in the [Ring camera] video." Detective Martin later traveled to an address that was a mile or two from Kathy's house to speak to Kathy. Detective Martin testified that, when she arrived, Kathy was in a vehicle with Leah and Leah's boyfriend. Detective Martin stated that Kathy was "very distraught" and that her hair and clothing were wet.

Jairo Ramirez testified that he lived on Sims Road and that, on the evening of March 15, 2022, he went outside because his dogs were barking; he saw a man, whom he identified as Defendant, crouching between two vehicles in the driveway. Mr. Ramirez stated that Defendant stood up, approached him, and said that he had been in a car wreck. Mr. Ramirez noticed that Defendant was "moving his head and body" and acting agitated and "concerned about something." Mr. Ramirez stated that Defendant was "very clean, very decent, [and] wearing decent clothes," a clean white shirt and pants. Mr. Ramirez testified that his wife also came outside and that he asked Defendant if he needed him to call the police, at which point Defendant walked backward and ran toward the road. Minutes later, a sheriff's deputy arrived, and Mr. Ramirez showed him a surveillance recording from the front porch camera. The recording, which was received as an exhibit, was time-stamped 8:07 p.m. and generally consistent with Mr. Ramirez's description of the encounter.

Ali Swiderski testified that she lived on Henslee Road with Mr. Swiderski, their children, her father, and her brother. Mrs. Swiderski testified that, around 6:30 or 7:00 a.m. on March 16, 2022, a man she identified as Defendant knocked on their door. Mr. Swiderski was already at work, so Mrs. Swiderski's brother answered the door. Mrs. Swiderski heard Defendant ask if he could use a telephone to call a taxi. Mrs. Swiderski said that her brother stepped outside so that Defendant could use his cell phone. Mrs. Swiderski stated that Defendant was wearing blue and white plaid pajama pants and a shirt with a Betty Boop image. When Defendant saw police cars passing, he looked around and asked to come inside the house, but Mrs. Swiderski's brother refused. After about ten minutes, a sheriff's deputy pulled into the driveway and asked them if they knew Defendant. Mrs. Swiderski's father sent Mrs. Swiderski photographs from the house's surveillance system showing that Defendant had looked inside two vehicles in the

driveway, had tried to open the vehicles' doors, and had looked in their home's sliding glass door.

BCSO Deputy Donald Perdue testified that, on March 16, 2022, he responded to an "unwanted person" call at the Swiderski property on Henslee Road. When Deputy Perdue arrived, a man, whom he identified as Defendant, was standing in the driveway. Defendant was wearing a Betty Boop shirt and pajama pants. Deputy Perdue overheard Defendant tell another officer that he had been riding in a friend's car, that he and the friend argued because he owed the friend money, and that the friend told him to exit the car at the intersection of Henslee and Sims Road. Defendant claimed that he was trying to call a taxi. After speaking to Mrs. Swiderski and viewing surveillance photographs on her cell phone, Deputy Perdue arrested Defendant.

TBI Special Agent Joshua Savley testified that he was the area supervisor in charge of the victim's murder investigation and that he went to the Swiderski residence to interview Defendant after his arrest. Agent Savley spoke to Defendant in his police cruiser. Agent Savley noted that, although he recorded the conversation, he accidentally dropped his recorder onto his driveway and ran over it. As a result, the recording was destroyed. Agent Savley agreed that he had typed a summary of the interview at the time it occurred.

According to Agent Savley, Defendant identified himself and said that the previous day, his friend Jamal had driven him to visit Eric on Sims Road around 9:00 or 10:00 a.m.; Defendant stated that Eric, Kathy, and a woman with "reddish orangish hair," whom Defendant had seen before but did not know, were present when he arrived. Defendant said that, at some point later, a man wearing a Georgia Bulldogs shirt and a black hat and a biracial woman with short black hair came to the house.

Defendant told Agent Savley that the man and woman went into the kitchen with Eric and that Jamal, the woman with red hair, and Defendant stayed in the living room. Defendant went outside, and the woman with red hair followed and told him that Eric had said something that upset her. Defendant said that he attempted to calm the woman and that, as he stood at the end of the driveway, he saw a neighbor watching him. Defendant stated that he wanted to leave and called a taxi, but by the time it arrived, he no longer wanted to leave. Defendant said that the woman with red hair also considered leaving but decided against it. Defendant stated that he paid the taxi driver eight dollars "for his trouble[.]" Defendant eventually left with Jamal in his truck, and he saw the woman with red hair walking up the road away from the house.

Defendant stated that he returned to the place where he had been staying, where he remained for the rest of the afternoon and evening. Defendant stated that he met a woman there named Angel who resembled the woman he met at Kathy's house. He said that he found out that Angel was the red-haired woman's sister.

Defendant stated that, the following morning, he was walking to the liquor store when he saw Jamal driving past; Jamal asked if Defendant wanted to ride around and smoke marijuana, and Defendant agreed. Defendant said that they drove toward Kathy's house and saw police officers in the area. Jamal and Defendant argued, and Jamal accused him of stealing "some stuff" and kicked him out of the truck. Defendant claimed that he had knocked on the Swiderski's door to ask them to use their telephone.

Agent Savley testified that he asked Defendant about his attire and that Defendant said that "this is what he had." Agent Savley later collected Defendant's and Eric's clothing; he noted that there was confusion about the victim's identity and that, as a result, they collected the clothing of both men they knew had been at the scene.

Vicky Darnell testified that she lived on Sims Road and that, on March 15, 2022, her nephew called and asked her to stay inside because something had happened near her house. Ms. Darnell testified that, five days later, she found a hoodie that did not belong to anyone in her household behind a chair on her front porch. The following day she called the police, and a TBI agent collected the hoodie.

Jason Martin testified that his parents lived on Henslee Road and that he kept two vehicles there. He stated that, on March 21, 2022, he found a pair of blue jeans and a belt in the trunk of his Chevrolet Tahoe; after he realized they were not the size his father wore, he asked his wife to call the police because he knew a crime had occurred nearby. Mr. Martin identified photographs of the blue jeans. Mr. Martin noted that he also found a muddy knee print in the backseat. On cross-examination, Mr. Martin testified that he did not see bloodstains on the blue jeans.

Jennifer Martin, Mr. Martin's wife, testified that she and the police searched outbuildings on the property and determined that one of them had been "rummaged through." She stated that the police collected a t-shirt from the outbuilding and showed her photographs of clothing collected from Defendant after his arrest. Mrs. Martin identified the Betty Boop shirt and blue and white pajama pants as clothing that had been stored in the outbuilding for a yard sale.

Agent Anderson testified that he was the "case agent" for the victim's murder investigation and that he arrived at Kathy's house around 5:00 a.m. on March 16. He later spoke to Kathy, Leah, Leah's boyfriend, and he interviewed Eric at the Maury County Sheriff's Office. Agent Anderson interviewed Ms. Shepherd about one week after the murder; he was unaware of any pending charges she had at the time, and he denied that she brought up wanting "consideration" in exchange for her information. Agent Anderson agreed that Ms. Shepherd provided "pretty specific time frames" using her Google Maps information.

Agent Anderson testified that he interviewed Defendant on March 17 and again on March 21. Recordings of the three-hour March 17 interview and the two-and-a-half-hour March 21 interview were played for the jury and received as exhibits.

In the recordings, Defendant gave numerous, inconsistent versions of the events of March 15 and 16. However, Defendant maintained throughout both interviews that he did not kill the victim. Defendant initially stated that he, Eric, Kathy, Jamal, and the victim were at Kathy's house but that Defendant and Jamal left together in the afternoon of March 15. In some versions of Defendant's story, he and Jamal spent the night at the Bedford Manor trailer park, and at one point Defendant claimed to have obtained from Jamal's girlfriend the clothing he was wearing when he was arrested. Agent Anderson testified that Defendant eventually admitted that "the entire story about Jamal" was fabricated.

Defendant initially claimed that he did not have a relationship with the victim but acknowledged that he previously slept with her. Later, Defendant admitted that he was in a relationship with the victim and loved her, and by the end of his second interview, he had repeated multiple times that he had intended to marry the victim. Defendant also claimed, however, that the victim and Eric were in a "real relationship" and that they had a child together.[3] Defendant stated that the victim slept with other men but that he was not jealous.

Agent Anderson testified that, on March 17, Defendant initially stated he had been trying to call the victim but had not been able to reach her since the night of March 15. When Agent Anderson confirmed that the victim was dead, Defendant stood up and began loudly weeping as though he was learning this information for the first time. Agent Anderson noted, however, that Defendant later said he knew the victim was dead before he left Kathy's house. He said that Defendant initially denied having ever driven the 4Runner but eventually admitted that he had taken it from Kathy's house and crashed it.

Agent Anderson testified that Defendant described "some type of conspiracy going on" and that Defendant suggested the victim was going to drug him. Defendant claimed that Eric told him there was a "price tag on [Defendant's] head" for two and a half million dollars; that Eric was supposed to kill Defendant; that Eric had been "watching him" for a couple of years; and that because Eric had not killed Defendant, Eric had to kill the victim. Defendant also told Agent Anderson that, prior to the murder, the victim left the house and came back. He said that, while she was gone, Eric took a phone call and that Eric was teary-eyed when he hung up the call. Defendant said that Eric told him that he, meaning Eric, "had to make a choice." Defendant claimed that, when Ms. Shepherd and Mr. Marsh later walked into the house, they looked at the victim on the couch and asked Eric, "[W]hy hasn't it been done yet[?]"

---

[3] Agent Anderson testified that he was unable to confirm that Eric and the victim had a child together.

In the interviews, Defendant additionally claimed that Eric was a cartel member who had been told that, if the victim did not kill Defendant, Eric had to kill the victim. Defendant said that Eric lured him to Kathy's house by telling him that he was going to front him drugs and make a lot of money. Defendant stated several times that Eric and the victim used "ice" but that he only smoked marijuana; he said that Eric, the victim, and Kathy were all "lit" that day and that the victim was "always high." Defendant said that he knew that either he or the victim was going to die.

Defendant stated in several versions of his story that Eric or the victim had drugged him. Defendant said that the victim previously laced his marijuana with other drugs and that he believed the victim was supposed to kill him. Defendant described feeling "funny" and falling asleep on the couch after pouring himself Sundrop soda from a two-liter bottle. Defendant also said that, after drugging him, Eric made him touch items in the house—the fireplace grate, firewood, and a kitchen mop. He stated that Eric used the grate to pull a box containing a gun out of the fireplace.

Agent Anderson testified that they did not find any Sundrop soda bottles at Kathy's house. He agreed that Defendant claimed that the soda was drugged even though he poured it himself. Agent Anderson testified that Defendant discussed "out of the blue" that he had touched the fireplace grate and two pieces of firewood; the agents had not mentioned the items.

Defendant stated in his interviews that the victim and Eric argued the day of the murder and were "at each other's throats" for various reasons, including that Eric supposedly admitted to killing the victim's sister. One of the later versions of the story included Defendant's grabbing the victim and taking her outside after she pulled a knife on Eric. Defendant stated several times that the victim left Kathy's house on foot in the afternoon of March 15, either because of the argument or because she wanted to go buy cigarettes.

In the interviews, Defendant also asserted that, after he was drugged, he fell asleep on the living room couch and awoke to see the victim lying on the floor; he stated that he saw Eric washing his hands in the kitchen sink. Defendant said that he grabbed Kathy's car keys, stepped over the victim, and fled the residence. Defendant said that the victim must have returned to Kathy's house while he was asleep; he maintained that he did not hear the victim's being beaten even though she was about five feet from the couch. Defendant claimed that Eric did not see him leave the house but then said that Eric hit him with something as he left, and Defendant lifted his shirt to show Agent Anderson a mark on his torso. He also stated that someone had been shooting at the 4Runner and posited that the reason the 4Runner crashed was because the tires were shot out. Defendant stated that, as he pulled out of the driveway, Kathy was on the front porch and called to him to ask for a cigarette; in another version of the story, Kathy yelled at him not to take her car.

When Agent Anderson asked Defendant during the second interview why he left instead of confronting Eric, Defendant said that he did not see Eric do anything. Later, however, he stated that Eric was capable of "doing something to somebody" and of putting the blame on a third party. When Agent Anderson informed him that the kitchen sink did not work, Defendant insisted that he saw Eric using it. Defendant said that he thought Eric had hurt the victim because she had "snitched" on Eric.

During the second interview, Defendant stated that, after crashing the 4Runner, he walked about half a mile through grass and fell asleep in some bushes for thirty to forty minutes. Defendant stated that he knew people who wanted to kill him were looking for him at that point. When confronted with the fact that only six minutes passed between the time of the crash and Defendant's contact with the Ramirezes, Defendant stated that he was impaired.

Agent Anderson testified that Defendant told them that he had been wearing a black hoodie, a black shirt, and black jeans, which was not the clothing in which he was arrested the next morning. Agent Anderson stated that Defendant initially claimed to have left Kathy's house with all of his clothing, including the Betty Boop shirt. During the interviews, when asked where he got the Betty Boop shirt and pajama pants, Defendant gave several different explanations. He also named different locations where he changed his clothing, but he eventually admitted to taking off and throwing away some of his clothing while he was walking around the neighborhood after the 4Runner crashed. When pressed, Defendant admitted to having left his pants in a vehicle and to getting the pajama pants from a shed behind a house. Defendant also said that he was wearing two shirts and that he threw a white shirt "around their shed somewhere." Defendant said that he lied about where and how he changed his clothes because he knew "in [his] heart that [the agents were] going to try to pin it on [him]." When asked why he changed clothes, Defendant asserted that police officers had told him that a White woman had been beaten to death. When it was pointed out that Defendant had changed clothes before he had spoken to any officers, Defendant stated that he had "heard the thing come over a person's phone" when speaking to one of the neighbors.

When Agent Anderson told Defendant near the end of the second interview that he would be charged with the victim's murder, Defendant stated that he had a video from the night of the murder that explained why the victim was killed. Defendant said that it would clear his name. He initially stated that it identified the murderer; he later said that it showed the murder. Defendant said that the recording was on "one of their" phones and that he took it because he knew that the police would blame him for the victim's death. He asked to speak to his godparents before telling the police the location of the video. Defendant stated that he did not want to put himself in a "predicament" by not having anything with which to fight for himself. Defendant stated that he gave the video to someone to give to

his godparents. Agent Anderson testified that, at the time of trial, he had not received such a video.

Upon questioning by Agent Anderson, Defendant agreed that he had previously been arrested for domestic violence against the victim. Defendant acknowledged that the victim previously told someone that she feared for her life and that she did not know what Defendant would do. Defendant stated, however, that the domestic violence charge had been dismissed and that the victim had done bad things to him, like pulling a knife on him three times. Defendant acknowledged that he had lied to the agents, but he maintained that he did not kill the victim.

Agent Anderson testified that Defendant voluntarily gave blood and DNA samples at the end of the first interview.

On cross-examination, Agent Anderson testified that he was unqualified to determine if a person was medically competent to answer his questions or suffering from a concussion. He stated that he generally interacted with a person to determine "whether or not they are cognitive enough to be able to answer questions[.]"

Agent Anderson testified that Defendant brought to his attention that Eric was involved in "drug activity"; however, they did not find any drugs in Kathy's house. He agreed that Defendant had methamphetamine and amphetamine in his blood on March 17.

Agent Anderson agreed that no evidence was collected from the kitchen sink and that he did not ask the Violent Crime Response Team ("VCRT") to "look at" the sink; he agreed that Defendant mentioned Eric's washing his hands during both interviews. Agent Anderson stated that Defendant lifted his shirt during the interviews to show them his side and that there was "maybe some discoloration of some kind." Agent Anderson did not recall interviewing anyone who said that Defendant had left prior to the victim's murder.

TBI Special Agent Carrie Schmittgen, an expert in forensic biology, testified that she worked with the VCRT to process the crime scene at Kathy's house. She stated that blood was present on the side door, on the kitchen floor, on two bedroom door frames, on the couch, and throughout the living room. She did not think that any blood was found around the kitchen sink. Agent Schmittgen identified additional photographs of the crime scene, which showed a forked piece of wood covered with blood on one end. Agent Schmittgen stated that they also collected cigarette butts from the living room, fabric from the sheet covering the front door, and broken glass from the living room floor. She denied that they found any weapons near the victim.

Agent Schmittgen conducted DNA testing on items from the 4Runner and Kathy's house and on Defendant's and Eric's clothing and shoes. She noted that hair was found on

the bloody pieces of firewood and the fireplace grate but that the TBI did not test hair. She stated that blood and the victim's DNA was found inside the 4Runner on the clock, underneath the steering wheel, and on the gas pedal. Inside Kathy's house, the bloodstained ends of the piece of firewood on the floor near the victim's body matched the victim, and an inconclusive male profile was also present. The other end contained "touch DNA" that matched the victim, Defendant, and an inconclusive third profile. The bloodstained end of the forked piece of firewood from the wood pile matched the victim's DNA, and the other end contained touch DNA that matched the victim and an inconclusive male profile.

The fireplace grate contained eight "prongs" and two "crossbars," all of which tested presumptively positive for blood. DNA from Prongs 1 and 2, as well as the right and left crossbars, matched the victim and Defendant; Prong 2 also contained an inconclusive third profile. Prongs 3, 4, 5, 6, 7, and 8 matched the victim and also contained an inconclusive second profile; the second profile on prongs 6, 7, and 8 was male.

The piece of glass from the living room floor contained a stain that tested positive for blood. The blood matched the victim's DNA and contained an inconclusive male profile. A piece of the sheet covering the front door tested positive for blood and matched the victim.

The hoodie found on Ms. Darnell's front porch tested negative for blood. Swabs for "wear DNA" contained three DNA profiles, at least one of which was male; Defendant was the major contributor. Defendant's left shoe tested negative for blood. Agent Schmittgen noted that blood could be rubbed away by a person's walking or being in the rain. Agent Schmittgen said that Defendant's right shoe tested presumptively positive for blood, but the sample was too small for further testing. Defendant's clothing, including the Betty Boop shirt and pajama pants, tested negative for blood except for one black sock. The sock had a mixture of three DNA profiles, with Defendant being the major contributor, and the minor contributors were inconclusive. The pants, belt, and white t-shirt found at the Martin residence on Henslee Road and a black hoodie from the 4Runner tested negative for blood.

Agent Schmittgen stated that Eric's shoes, sweatpants, and underwear tested negative for blood. Eric's long-sleeved shirt had a spot of the victim's blood on the middle lower back.

On cross-examination, Agent Schmittgen testified that she only received DNA standards for the victim and Defendant and that she could only identify DNA as belonging to a specific person with a standard. She agreed that a person could wear gloves to conceal their DNA from a crime scene. Agent Schmittgen stated that she tested the entire surface area of the blue jeans from Mr. Martin's Tahoe and that they were negative for blood.

TBI Special Agent Paige Yawn, an expert in microanalysis, testified that she processed shoe impressions collected at Kathy's house and compared them to the shoes provided by Leah, Kathy, Eric, and Defendant. Agent Yawn stated that she analyzed eighty-four impressions, some of which were made of dust or dirt and others of which were in blood. Several bloody impressions consistent with the brand of Defendant's shoes were found around the victim's upper body and in locations around the living room. A smaller number of bloody impressions in the living room were consistent with Eric's brand of shoes, and one bloody impression in the kitchen was consistent with Leah's brand of shoes.

TBI Special Agent April Bramlage, an expert in forensic toxicology, testified that she analyzed a sample of blood collected from Defendant on March 17, 2022. The blood contained "Carboxy THC," a marijuana metabolite; methamphetamine; and amphetamine, which likely was a metabolite of the methamphetamine.

Davidson County Assistant Medical Examiner Dr. Shannon Crook, an expert in anatomic, clinical, and forensic pathology, testified that she performed the victim's autopsy. She found that the victim's cause of death was blunt force injuries to the head, and the manner of death was homicide. Dr. Crook stated that the victim's blood contained methamphetamine and amphetamine. The victim had extensive bruising, abrasions, and lacerations to her head, face, and neck, some of which went down to the bone. Dr. Crook noted that some of the abrasions had a curved and intersecting pattern. She had a scleral hemorrhage of the inner right eye, and blood and "pulpified brain tissue" were visible in the left ear canal. Dr. Crook agreed that "nearly [the] entire brain area [was] bleeding" underneath the scalp and its muscles; she stated that, additionally, the victim had hemorrhaging between the "arachnoid layer" on the top of the brain and the brain itself. Dr. Crook testified that the victim also had a "5 x 3 1/2 inch gaping, complex defect consisting of multiple overlapping lacerations" on the back of the head through which the brain was visible. Dr. Crook noted that, although she was unable to determine the number of strikes that caused the defect, it was caused by multiple blows.

Dr. Crook testified that the victim had a "hinge-type fracture . . . that goes through the entire portion of the basilar skull . . . from the sides of the skull. And it is typically due to a massive blow to the side of the head." Dr. Crook stated that it took a "greater than normal" amount of force to create a hinge-type fracture and such a fracture could itself be fatal.

Dr. Crook testified that the victim also had hemorrhaging in a muscle on the left front side of the neck; abrasions and contusions on the upper right side of the back, upper mid-back, right shoulder, arm, forearm, thumb, and finger; curved abrasions and bruising on the left shoulder, upper arm, forearm, elbow, wrist, and hand; and hemorrhage of the subcutaneous tissue and muscles of the left shoulder. Dr. Crook testified that the victim also had an abrasion and bruising of the lower front right thigh, the outer left thigh closer

- 14 -

to the hip, and beneath the left knee. Dr. Crook opined that the victim's injuries occurred while she was alive.

On cross-examination, Dr. Crook testified that she did not know how long it might have taken to inflict the victim's injuries. She stated that the victim would have become unconscious when the head injuries occurred but that she had no way to determine the order in which the injuries occurred.

After the State closed its proof, Defendant called one witness to testify on his behalf. Ronnie Nowlin testified that he lived beside Kathy. He stated that, on March 15, 2022, he saw emergency vehicles at Kathy's house. Mr. Nowlin stated that, early that morning, "a couple of people [were] fussing outside next to the road" and that, later, he was inside his house when he heard Kathy yell, "[D]on't take off in that vehicle[.]" Mr. Nowlin looked out the door and saw Kathy's 4Runner back out of the driveway. Mr. Nowlin said that he heard a woman calling for help after the 4Runner left Kathy's house. He was familiar with Leah's voice and denied that it was her.

On cross-examination, Mr. Nowlin agreed that he had told the TBI that, around noon or 1:00 p.m. on March 15, 2022, he saw a Black[4] man and a petite Black woman "fussing and arguing" outside Kathy's house; they went down the road, and a taxi later brought them back. Mr. Nowlin stated that he could not identify the couple. He said that the 4Runner left the house before he went to bed at 10:00 p.m. Mr. Nowlin noted that, although he did not see the 4Runner crash, he saw police lights at the intersection of Sims Road and Henslee Road from his porch. Mr. Nowlin stated that, after he saw the police lights, he went to the bathroom and heard a female voice through the bathroom window say, "[H]elp me[.]"

Upon this evidence, the jury convicted Defendant as charged. After a sentencing hearing, the trial court found that Defendant was a career offender and imposed a twelve-year sentence for the theft conviction, to be served consecutively to his mandatory life sentence for first degree premeditated murder. Defendant's motion for new trial was denied, and he timely appealed.

## II. Analysis

On appeal, Defendant contends that the evidence is insufficient to support his first degree premeditated murder conviction, arguing that the State provided no proof of his mental state and relied solely upon his flight from the scene and "concealment" to establish premeditation. Defendant does not contest the sufficiency of the evidence as to the other

---

[4] Although Mr. Knowlin could not identify the people he saw, the record reflects that the Mangrum family was White; Defendant and Mr. Marsh were Black; and the victim and Ms. Shepherd were biracial.

elements of first degree premedicated murder. The State responds that the evidence of premeditation was sufficient.

Defendant also contends that the evidence of the 4Runner's value was insufficient, arguing that Kathy only testified about the price at which it was listed for sale. Defendant avers that this figure is aspirational and does not establish Kathy's belief as to the vehicle's actual fair market value. Defendant does not contest the sufficiency of the evidence as to the other elements of theft. The State responds that the evidence of the 4Runner's value was sufficient.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

*a. Premeditation*

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

- 16 -

"Because premeditation involves the defendant's state of mind, of which there is often no direct evidence, we have long recognized that premeditation may be proved by circumstantial evidence . . . and may be inferred from the manner and circumstances of the killing[.]" *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (internal citations and quotation marks omitted). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Our supreme court has discussed that "numerous specific circumstances . . . may bear on the existence of premeditation," including,

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). However, this "list of specific circumstances developed through Tennessee caselaw is not exhaustive," and the trier of

fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.* at 917 (citing *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004)); *see Davidson*, 121 S.W.3d at 615; Tenn. Code Ann. § 39-13-202(e). "Ultimately, then, premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done after the exercise of reflection and judgment." *Reynolds*, 635 S.W.3d at 917 (internal citations and quotation marks omitted).

Viewed in the light most favorable to the State, a rational jury could find beyond a reasonable doubt that Defendant killed the victim after the exercise of reflection and judgment. Our review of the record reflects that the State did not rely solely upon Defendant's flight and concealment to establish premeditation. The State's closing argument emphasized the extent of the victim's injuries and the multiple blows inflicted upon her; its discussion of Defendant's flight and changing his clothes throughout that process occurred primarily regarding his consciousness of guilt and identity, which was the main issue at trial. The State's evidence established the following factors in support of the jury's finding that Defendant acted with premeditation: (1) The victim was unarmed; (2) No evidence indicated that the victim provoked the attack; (3) Defendant used three different weapons in succession; (4) Defendant inflicted numerous blows; (5) Kathy testified that Defendant saw her when she entered the living room and then turned and continued beating the victim; (6) The killing was particularly cruel given its brutal method, the extent of the victim's injuries—which Dr. Crook testified were inflicted while she was still alive, and the fact that the victim begged Defendant not to hit her anymore moments before he killed her with the fireplace grate; (7) The victim was found lying face down near the front door, which supports an inference that she was trying to escape; (8) Defendant failed to render aid to the victim; and (9) Defendant secreted evidence, i.e., his clothing, in various locations around the neighborhood after the murder. The evidence was more than sufficient to support the jury's verdict relative to premeditation, and Defendant is not entitled to relief on this basis.

### b. *Value of the 4Runner*

A person commits theft of property "if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Theft of property is "[a] Class D felony if the value of the property . . . obtained is two thousand five hundred dollars ($2,500) or more but less than ten thousand dollars ($10,000)[.]" Tenn. Code. Ann. § 39-14-105(a)(3).

"Value" is defined as "[t]he fair market value of the property or service at the time and place of the offense" or "[i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense[.]" Tenn. Code

Ann. § 39-11-106(a)(39)(A)(i)-(ii). Tennessee Rule of Evidence 701(b) provides that a "witness may testify as to the value of the witness's own property[.]" As the State notes, this court has held that "an owner may testify as to the value of his personal property even though he may not qualify as an expert on its market value." *State v. Rickman*, 631 S.W.2d 448, 450 (Tenn. Crim. App. 1981).

Defendant's complaint that the price for which Kathy listed the 4Runner for sale does not reflect her true opinion of its value is not well received. Similarly, Defendant's argument in his reply brief that the State "never asked . . . what [Kathy], as the owner, believed her vehicle was worth," is unavailing. The record reflects that the prosecutor asked Kathy, "Can you tell the jury how much that car cost or *what the value was to you*?" (emphasis added). Kathy responded that she had it listed for sale for $3,000. A rational interpretation of her answer is that she believed it was worth $3,000.

This court[5] has concluded that a property owner's testimony regarding value is sufficient, standing alone, to support a conviction for the theft of that value of property. *See, e.g., State v. Firestone*, No. W2016-00347-CCA-R3-CD, 2017 WL 634782, at *4 (Tenn. Crim. App. Feb. 16, 2017) (stating that it was the factfinder's purview to accredit the victim's testimony regarding the number and value of items that were stolen and that the evidence was sufficient to support a Class C felony theft conviction), *no perm. app. filed*; *State v. Hill*, No. M2012-00982-CCA-R3-CD, 2013 WL 1092724, at *8 (Tenn. Crim. App. Mar. 15, 2013) (holding that the victim's testimony, "if credited by a jury, sufficed to establish that the defendant was guilty of theft of property valued at $1,000 or more but less than $10,000"), *no perm. app. filed*.

Defendant's underlying concern that a property owner could testify to an inflated value bears on witness credibility and weight of the evidence, which is the province of the finder of fact. *See, e.g., Reaves v. State*, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975) (stating that, when the owner of an air conditioning unit stated it was worth $400 to $500 but did not know the current market value and the trial court instructed the jury on both grand and petit larceny, the "weight of . . . the testimony was for the jury"); *Rickman*, 631 S.W.2d at 450 (stating that the "weight to be given [a business owner's] testimony [about the value of stolen items from that business] was for the jury's determination").

The evidence of the 4Runner's value was sufficient, and Defendant is not entitled to relief on this basis.

---

[5] We note that Defendant cites to cases from our Court of Appeals for the proposition that "there must be some evidence, apart from mere ownership," that an owner's estimate of his property's value "is a product of reasoned analysis and not based on pure speculation." *Halliman v. Heritage Bank*, No. M2014-00244-COA-R3-CV, 2015 WL 1955448, at *5 (Tenn. Ct. App. Apr. 30, 2015), *no perm. app. filed*. The jurisprudence governing civil matters does not control here, especially when case law from this court exists to the contrary.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.


_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE